BENTON, BENTON & BENTON, A Professional Law Corporation, Plaintiff–Appellant,

v.

The LOUISIANA PUBLIC FACILITIES AUTHORITY, A Louisiana Public Trust and Public Corporation, et al., Defendants–Appellees.

No. 88–3885.

United States Court of Appeals, Fifth Circuit.

March 30, 1990.

Michael Needle, Needle & Feldman, Philadelphia, Pa., J. Arthur Smith, III, Aub. A. Ward, Naquin & Ward, Baton Rouge, La., for plaintiff-appellant.

Leon Gary, Jr., Gary, Field, Landry & Dornier, Baton Rouge, La., Thomas R. Jackson, Joseph McEntee, Jones Day, Reavis & Pogue, Dallas, Tex., for La. Public Facilities.

Gordon A. Pugh, Brezeale, Sachse & Wilson, Baton Rouge, La., for Hicks.

Gene W. Lafitte, Frank E. Massengale, Liskow & Lewis, New Orleans, La., for Foley, Judell, et al.

John David Ziober, McCollister, McCleary, Fazio & Holliday, Wallace A. Hunter, Baton Rouge, La., for McCollister, et al.

Before JOHNSON, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellant Benton, Benton & Benton, a Baton Rouge law firm, sued the Louisiana Public Facilities Authority (LPFA), two Baton Rouge law firms, and Steve Hicks, a Baton Rouge lawyer, for violations of the Sherman Act. Benton complained that the LPFA engaged in antitrust violations in its hiring of bond counsel. The district court granted the defendants' motion for summary judgment. We affirm.

 Appellees assert and the district court held that the LPFA is a state agency. Benton argues that the LPFA is not a state agency under either the Louisiana Constitution or Louisiana state law. After careful review of the record, we find that the district court properly and thoroughly analyzed this issue. Hence, we find no error in the district court's reasoning that the LPFA, at least for these purposes, is a state agency and enjoys immunity as a public agency from the allegations Benton

charges. Additionally, we conclude that the district court was correct in determining that private parties acting pursuant to the state's policy decisions are also shielded from this complaint. Because we conclude the district court properly decided these issues, we affirm the decision of the district court based upon its opinion. It is attached as an appendix.

Appellant places heavy reliance upon a particular Louisiana decision for its claim that the LPFA is not a governmental agency. The case is *Harris v. Trustees of Louisiana Public Facilities Authority*, 358 So.2d 958 (La.Ct.App.1977) (opinion on motion to dismiss appeal, hereinafter *"Harris I"*). A later associated case is *Harris v. Trustees of Louisiana Public Facilities Authority*, 356 So.2d · 1039 (La.Ct.App. 1977), *cert. denied,* 357 So.2d 558 (La.1978) (opinion on merits, hereinafter *"Harris II"*). Benton relies upon a statement by the court in *Harris I* that the LPFA is "not" a "governmental unit." *Harris I,* 358 So.2d at 959. The district court and appellees rely in response upon a portion of *Harris II* that explains that the LPFA is "a corporation created by the Legislature and empowered to act for public purposes." *Harris II,* 356 So.2d at 1041. Because of the statement in *Harris I* upon which appellant relies, we find it important to make a brief additional comment on the two cases.

*Harris I* dealt with a specific issue as to whether the summary procedures of the Bond Validation Act, La.R.S. 13:5121, *et seq.* (West Supp.1990), applied to the LPFA so as to make its appeal untimely. In its decision, the court determined only that the LPFA was not a "governmental unit" as defined in the Bond Validation Act. *See Harris I,* 358 So.2d at 959–60, 959 n. 1. In *Harris II,* in contrast, the Louisiana court offered a more complete portrayal of the LPFA's identity. It quoted the Louisiana district court, which had explained:

> It is clear that a public trust authority created under the Public Trust Act is neither a political subdivision of the State nor a municipal corporation. It is a unique creature of the Legislature desig-

nated as a 'public corporation' in R.S. 9:2341. It is a corporation created by the Legislature and empowered to act for public purposes.

*Harris II*, 356 So.2d at 1041–42. The district court's reliance on this portion of *Harris II* was proper. Accordingly, we see no error in its determination that the LPFA is a public agency fulfilling a public function for purposes of evaluating coverage under the Sherman Act. We see no conflict between such an interpretation and the decision in *Harris I*.

AFFIRMED.

## APPENDIX

United States District Court, Middle District of Louisiana.

Benton, Benton & Benton

v.

The Louisiana Public Facilities Authority, et al.

Civil Action No. 85–969–A.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the court upon a motion for summary judgment filed on behalf of each of the four defendants. There has been oral argument and extensive briefing by all parties.

This action is brought by a Baton Rouge law firm against the Louisiana Public Facilities Authority; Steve E. Hicks, a Baton Rouge lawyer; and two law firms, the Foley firm and the McCollister firm. The complaint alleges violations of the Sherman Act—that the defendants have conspired to monopolize and have monopolized the business of providing bond counsel services on Authority bond issues.

The Authority is a trust created by a 1974 trust agreement under the provisions of LSA–R.S. 9:2341, et seq. Under § 2341

1. The Louisiana law authorizes such public trusts to issue bonds for "any authorized public function or purpose of the state" or any local governing body. Under Section 2341 B "authorized public functions or purposes" is defined relatively broadly as:

D, all such trusts are "public corporations" of the beneficiary, which in this case is the state of Louisiana.

This law suit is generated, in large measure, because of the provisions of the Internal Revenue Code, 26 U.S.C. § 141 et seq., which provide for exemption from federal income taxation of interest received on "municipal bonds." Many years ago, the Congress, in its wisdom, decided that bonds issued by state and local governments for public purposes ought to be made exempt from income taxation in order to improve the competitive standing of such bonds with corporate and other bonds and to lower the cost of public improvements. Some folks refer to this as a "loop hole" in the tax laws. Others call it sound public policy.

In any event, if by that tax exemption the Congress intended to increase the issuance of municipal bonds, it succeeded beyond anyone's wildest imagination. A practice of issuing "conduit" bonds arose by which a local governmental unit would issue in its name bonds to finance private projects in which it had no interest and for which it assumed no actual repayment obligation. The private party assumed all responsibility for payment of the bonds. The early "conduit" bonds were generally industrial development bonds used to finance local projects which the governing body assumed would benefit the community by providing jobs or other benefits. Since the interest on the bonds was tax exempt, they generally bore a lower rate of interest than corporate bonds which would otherwise have been issued. With typical American ingenuity, by the late 1970s tax free "municipal" bonds were being used to finance such "public" improvements as retail stores, fast-food outlets, commercial establishments, shopping centers and apartment complexes, as well as hospitals, schools, pollution control equipment and transportation facilities.[1]

... hospital, medical, health, nursery care, nursing care, clinical, ambulance, laboratory and related services and facilities; housing, mortgage finance and related services, activities, facilities, and properties; penitentiary, rehabilitation, incarceration and other correc-

In the Deficit Reduction Act of 1984, the Congress, apparently concluding that tax exempt "municipal" bonds had become too much of a good thing, began imposing restrictions and limitations upon both the purposes for which such bonds could be issued and the amount which would be accorded tax exempt status. Effective January 1, 1985, a money limit or cap on the amount of such private "municipal" bonds which could be issued was imposed upon all issuing agencies in each state. As subsequently amended, that provision is in 26 U.S.C. § 146. The governor of each state was granted authority by the federal law to allocate the ceiling for each issuing agency in that state. Louisiana's then governor issued an executive order which allocated sixty percent of the state's total dollar limit to the Louisiana Public Facilities Authority. Since January 1, 1985, then, the Authority has become the biggest player in the game in Louisiana.

The complaint alleges that since its inception in 1974, the Authority has consistently used only Hicks or the law firm of which he was a member as bond counsel and that, because the Authority controls the giant's share of all tax exempt municipal issues in Louisiana, it and the other defendants have conspired to and are in engaging in a mo-

nopoly of bond counsel services in Louisiana. The Authority and the other defendants freely admit that it uses the services of Hicks and the other defendants on almost every bond issue and that it has never used the plaintiff law firm.

The Authority has no taxing power [2] and issues revenue bonds for projects to be constructed and operated by others. The bonds are to be repaid from the revenues of the project and, although the bonds are issued in the Authority's name, it assumes no responsibility for repayment (it is conceivable, under the law, that the Authority could have some liabilities, although not directly for payment of the bonds).[3]

It is undisputed that the conduit tax exempt bond process begins with an interested project owner, say a hospital district (or a private hospital) which wants to expand. The tax exempt bonds are issued by the Authority, are sold to a bank, a group of banks, or to underwriters who regularly deal in such bonds. The bonds are paid out of the revenues of the hospital, usually through a bank which acts as a paying agent. The Authority names a lawyer to represent it as "special counsel" and the Authority requires that his fees be paid out of the proceeds of the bond issue. The Authority also names "bond counsel,"

tional services and facilities; educational services and facilities and related housing and dormitory services and facilities; providing, developing, securing and improving water storage, treatment, supply and distribution services and facilities; sanitary and storm sewer and other liquid and solid waste collection, disposal, treatment and drainage services and facilities; educational or commercial communication equipment and facilities; mass transit, commuting and transportation and parking services, equipment and facilities; cultural and civil facilities, services and activities; community development and redevelopment facilities and activities; gas, electric, petroleum, coal and other energy collection, recovery, generation, storage, transportation and distribution facilities and activities; industrial, manufacturing and other economic development facilities and activities; antipollution and air, water, ground and subsurface pollution abatement and control facilities and activities; airport and water port and related facilities, services and activities; and facilities, property and equipment of any nature for the use or occupancy of the state or the United States ...

**2.** Section 2347 I specifically provides that all bonds issued by such a trust "shall be special obligations of the trust and shall be deemed to have been issued on behalf of the beneficiary of the trust. In no event shall any bonds, notes or other evidences of indebtedness of a trust constitute an obligation, either general or special, of the state of Louisiana or the beneficiary of the trust ... and the bonds shall contain a recital to that effect."

**3.** Section 2347 A(2) provides, "All such bonds shall be negotiable instruments, and shall be solely the obligations of the trust and not of the state of Louisiana or the beneficiary. The bonds and the income thereof shall be exempt from all taxation in the state of Louisiana. The bonds shall be payable out of the income, revenues and receipts derived or to be derived from the trust properties and facilities maintained and operated by the trust or received by the trusts from any other sources whatsoever, including, but not by way of limitation, other moneys which, by law or contract, may be made available to the trust ..."

usually Mr. Hicks, and requires that his fees also be paid out of the proceeds of the bond issue. On larger issues and those which are not "presold" to a bank or group of banks, additional bond counsel from New York or Chicago or other metropolitan areas may also be necessary because the underwriters require such an opinion. The opinion of bond counsel as to the validity and tax exempt status of the bonds is frequently printed on the bonds themselves.

Each of these defendants asserts that the Authority is simply exercising its fundamental right to choose its own lawyer in such a scenario. Each motion for summary judgment presents three claims: (1) the manner in which the bond counsel is chosen does not violate the anti-trust laws; (2) the activities of the Authority are immunized from anti-trust laws by the "state action doctrine;" and (3) the activities of the private defendants (Hicks and the two law firms) are shielded from anti-trust laws by the Noerr–Pennington Doctrine.

## I.

Plaintiff claims that the activities of the defendants constitute a *per se* violation of § 1 of the Sherman Act because it is an illegal tying arrangement: the defendants tie obtaining bond proceeds to the use of the legal services of lawyers selected by the Authority as bond counsel. Plaintiff also makes claims of boycott and exclusive dealing under § 1 and of monopolization, attempted monopolization and conspiracy to monopolize under § 2.

The defendants rely primarily upon cases such as *Forrest v. Capital Building & Loan Ass'n*, 385 F.Supp. 831 (M.D.La. 1973), aff'd, 504 F.2d 891 (5th Cir.1974); *[Sibley] v. Federal Land Bank of New Orleans*, 597 F.2d [459] (5th Cir.1979) [, cert. denied, *Board of Commissioners v. Federal Land Bank*, 444 U.S. 941, 100 S.Ct. 296, 62 L.Ed.2d 308 (1979)] and *Foster v. Maryland State Sav. & Loan Ass'n*, 590 F.2d 928 (D.C.Cir.1978), cert. denied, [439 U.S. 1071] 995 [99] S.Ct. 842 [59 L.Ed.2d 37] (1979).

See also, *Amey Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486 (11th Cir.1985).

This line of cases holds that there is no Sherman Act violation when a private financial institution requires a borrower to pay for the legal services rendered to the institution in connection with certifying that the institution has a valid, enforceable first mortgage upon the property which secures the loan. These cases hold that in the financial institution-borrower situation, the legal service is simply an incidental part of the extension of credit services and that they are not two products, hence, there is nothing to be tied.

The defendants argue that these cases apply to this situation and that under the undisputed facts, there is clearly no violation of the Sherman Act.

Initially we note that the defendants are incorrect as to the similarity of the Authority to the lending institution in the usual mortgage loan situation. The Authority when it issues bonds is the *borrower*, not the lender. Technically, the Authority issues the bonds, thereby borrowing money from the ultimate purchaser—the investing public.

Assuming, however, that some anti-trust violation can be made under these facts, the court is convinced that the other arguments of the defendants are sound.

## II.

In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that the Sherman Act does not apply to the anti-competitive conduct of a state "acting through its legislature." The court indicated that the decision rested on principles of federalism and state sovereignty. That case involved the California Agricultural Probate Act, a state statute which restricted competition among food growers in California. The court commented:

We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual

system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress. 63 S.Ct. at 313.

The court also pointed out, however, that the states do not have authority to grant immunity to those private parties who violate the Sherman Act "by declaring that their action is lawful." 63 S.Ct. at 314.

Subsequent decisions by the Court have made plain that local subdivisions of the state, as opposed to the state itself are not beyond the reach of the anti-trust laws by virtue of their status because they are not themselves sovereign. *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, at 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). In *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the Court concluded that the active state supervision requirement imposed upon private parties claiming such exemption, will not be imposed in cases in which the actor is a municipality. In a footnote, the court indicated without deciding that where the actor is a state agency, it is "likely" that active state supervision will also not be required. 105 S.Ct. at 1720, n. 10.

The defendants here claim that the authority is a state agency. It clearly is neither the state itself nor a municipality.

As we have seen, under § 2341 D, the Authority is a public trust and public corporation of the state. It is authorized to provide funding for "any authorized public function or purpose of the state." Every trustee is subject to the provisions of the law on public payroll fraud and public contract fraud and is required to take the oath of office required of public officials. § 2343 A. Meetings of the trustees are required to be open to the public and records are required to be public records and all contracts for construction, labor, equipment, material or repairs must be awarded according to the state's public bid

laws. § 2343 D and E. Trustees may be removed from office for malfeasance. § 2343 F(2). All public trusts are subject to the supervision of the legislative auditor of the state to the same extent as the public beneficiaries and such trusts are audited on an annual basis by the legislative auditor. § 2346. All bond issues must be submitted to and approved by the state bond commission and attorneys fees incurred in connection with the issuance of bonds shall be subject to approval of the attorney general. § 2347 H & K.

In *Harris v. Trustees of Louisiana Public Facilities Authority*, 356 So.2d 1093 [1039] (La.App. 1st Cir.1977), cert. denied, 357 So.2d 558 (La.1978), the court held, quoting the trial judge:

It is clear that a public trust authority created under the Public Trust Act is neither a political subdivision of the State nor a municipal corporation. It is a unique creature of the Legislature designated as a 'public corporation' in R.S. 9:2341. It is a corporation created by the Legislature and empowered to act for public purposes. 356 So.2d at 1041.

It is clear that the Authority is a public agency created by the state and that it performs public functions. The jurisprudence has extended the public immunity doctrine to similar special purpose public agencies. See *Cine 42nd St. Theatre Corp. v. Nederlander Org. Inc.*, 609 F.Supp. 113 (S.D.N.Y.1985), aff'd, 790 F.2d 1032 (2d Cir.1986); *Caribe Trailers System v. Puerto Rico Maritime*, 475 F.Supp. 711 (D.D.C.1979); *W.E. [E.W.] Wiggins Airways v. Massachusetts Port Authority*, 362 F.2d 52 (1st Cir.1966), cert. denied, 385 U.S. 947 [87 S.Ct. 320, 17 L.Ed.2d 226].

It is thus clear that the Legislature has authorized this public agency to issue bonds and to take all necessary steps in connection with the issuance. One of the necessary steps in connection with the issuance of bonds is the selection and employment of bond counsel. The court concludes that the Authority is a state agency and, as such, active state supervision of its activities is not required. *Town of Hallie v. City of Eau Claire*, supra. Accordingly,

the court concludes that assuming the Authority's activities in connection with selection and employment of lawyers on bond issues amounts to anti-competitive activity within the meaning of the Sherman Act, those activities are shielded by the state action immunity of *Parker v. Brown.*

Cases subsequent to *Parker v. Brown* have made clear that not only the state itself is immune but also private parties who act pursuant to the state's policy decisions. See *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), on remand, 764 F.2d 748 (11th Cir.1985). In *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the court held that a minimum fee schedule issued under the affirmative direction of the Arizona Supreme Court and enforced by its disciplinary rules constituted a restraint "compelled by direction of the state acting as sovereign" and thus the restraint was immune and the private lawyers were compelled to abide by the minimum fee schedule. On the contrary, in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) and *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the court held that the Sherman Act was violated by publication of a minimum fee schedule issued by a county bar association and enforced by the state bar because there was no compelled state activities and that mere approval by a state rate making commission of a private utility's tariff which violated the Sherman Act was not compelled state activity beyond the reach of the Sherman Act.

As the court pointed out in *Southern Motor Carriers,* supra, the state action doctrine does not require a showing that the state *compelled* private anti-competitive conduct in connection with a state agency; a showing that the state *authorized* such private conduct is sufficient. See *City of Lafayette v. Louisiana Power & Light Co.,* supra.

Here the selection of counsel is clearly made by the Authority, the public agency.

The private parties, the lawyers, are simply selected to perform legal services for and on behalf of the public agency. The state legislature clearly authorized the Authority to employ bond counsel in connection with the issuance of bonds and placed no restrictions upon the Authority in that connection, except that the attorney general must approve the fee. This court concludes that these private parties who are contracting with the public agency are also shielded by the state immunity doctrine, assuming that the practice would amount to a violation of the Sherman Act if engaged in by private parties alone. Under these circumstances, it is not necessary to pass upon the other issues in the case.

Accordingly, the motion for summary judgment on behalf of each defendant is hereby GRANTED and there will be judgment in favor of the defendants dismissing this action.

Baton Rouge, Louisiana, October 25, 1988.

/s/ John V. Parker
JOHN V. PARKER, CHIEF JUDGE
MIDDLE DISTRICT OF LOUISIANA