James D. ASKEW, Ginger Buck, Phillip Mahan, Plaintiffs–Appellees,

v.

DCH REGIONAL HEALTH CARE AUTHORITY, West Alabama General Hospital, Inc., Defendants–Appellants.

No. 92–6880.

United States Court of Appeals, Eleventh Circuit.

July 19, 1993.

Thad G. Long, Michael R. Pennington, John E. Goodman, Bradley Arant Rose & White, and Frank S. James, III, Lee H. Zell and Susan S. Wagner, Berkowitz Lefkovits Isom & Kishner, Birmingham, AL, for defendants-appellants.

Jeffery M. Cross, Barbara C. Baran, Julie L. Helenbrook, and Mary L. Smith, Ross & Hardies, Chicago, IL, Michael K.K. Choy, Cooper Mitch Crawford Kuykendall & Whatley, Birmingham, AL, for Askew, Buck, Mahan and the City of Northport, Ala.

Before KRAVITCH and HATCHETT, Circuit Judges, and ATKINS *, Senior District Judge.

KRAVITCH, Circuit Judge:

James Askew, Ginger Buck and Phillip Mahan (together, "the plaintiffs") brought this antitrust action against DCH Health Care Authority ("DCH") and West Alabama General Hospital, Inc. (now known as AMI West Alabama, Inc.) ("AMI") to prevent DCH from completing its acquisition of AMI. Plaintiffs alleged that through this purchase, DCH would capture "substantial market power in the market for inpatient services by acute care hospitals and become the dominant provider of such hospital services to the five county area comprising the northwest Alabama region."[1] This case requires us to determine the scope of the state action immunity doctrine enunciated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985).

## I.

In 1982 the Alabama state legislature enacted the Health Care Authorities Act of 1982, Ala.Code § 22–21–310 *et seq.* ("the Act"). The Act confers broad and explicit powers upon "health care authorities" to own, operate and manage health care facilities. In enacting the statute, the legislature aimed to address the needs of indigent and reduced-care patients by providing for new and different financing mechanisms for publicly-owned hospitals and other health care facilities. *See* Ala.Code § 22–21–312.

DCH was incorporated as a health care authority in 1982 pursuant to resolutions adopted by the governing bodies of Tuscaloosa County, the City of Tuscaloosa and the City of Northport. The Act defines "health care authority" as "[a] public corporation organized, and any public hospital corporation reincorporated, pursuant to the provisions hereof." Ala.Code § 22–21–311(a)(2). DCH's certificate of incorporation adopts all the power and authority provided by the Act.[2] At issue here is DCH's authority to

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. R.1–1 at 3.

2. Under Code § 22–21–318, DCH is granted various powers of authority:
   (a) In addition to all other powers granted elsewhere in this article, and subject to the

express provisions of its certificate of incorporation, an authority shall have the following powers, together with all powers incidental thereto or necessary to the discharge thereof in corporate form:
   . . . .
   (5) To acquire, construct, reconstruct, equip, enlarge, expand, alter, repair, improve, maintain, equip, furnish and operate health

acquire health care facilities. *See* Ala.Code § 22–21–318(a)(5).[3]

DCH owns and operates a public hospital in Tuscaloosa, Alabama known as Druid City Hospital; it provides inpatient acute care hospital services to the general public. Before the proposed transaction, AMI was a privately-owned hospital located in the City of Northport. AMI also provided, and continues to provide, inpatient acute care hospital services to the general public.

After filing their initial complaint, plaintiffs sought a Temporary Restraining Order ("TRO") to stop the sale of AMI to DCH.[4]

The district court denied plaintiffs' motion, holding that plaintiffs had failed "to carry their burden of irreparable injury ... and to show a substantial likelihood of success on the merits of their claim that the activities complained of are not immune from the operation of the antitrust laws." [5] After the TRO was denied, DCH and AMI moved to dismiss the case with prejudice or for summary judgment, arguing that, as a matter of law, they were immune from antitrust liability for the alleged conduct. At this point, the district court stayed all discovery except as to the immunity issue. Before arguments were

---

care facilities at such place or places, within or without the boundaries of its authorizing subdivisions and within or without the state, as it considers necessary or advisable;

....

(7) To receive, acquire, take and hold (whether by purchase, gift, transfer, foreclosure, lease, devise, option or otherwise) real and personal property of every description, or an interest therein, and to manage, improve and dispose of the same by any form of legal conveyance or transfer; ...

....

(23) To assume any obligations of any entity that conveys and transfers to the authority any health care facilities or other property, or interest therein, provided that such obligations appertain to the health care facilities, property or interest so conveyed and transferred to the authority;

....

(31) To exercise all powers granted hereunder in such manner as it may determine to be consistent with the purposes of this article, notwithstanding that as a consequence of such exercise of such powers it engages in activities that may be deemed "anticompetitive" within the contemplation of the antitrust laws of the state or of the United States....

Under Code § 22–21–358, which was added to the Act in 1990, DCH, as a health care authority, is authorized:

(4) To create, establish, acquire, operate or support subsidiaries and affiliates, either for profit or nonprofit, to assist such authority in fulfilling its purposes;

(5) To create, establish or support nonaffiliated for profit or nonprofit corporations or other lawful business organizations which operate and have as their purpose the furtherance of such authority's purposes; [and]

(6) Without limiting the generality of the preceding subdivisions ... to accomplish and facilitate the ... acquisition ... of any such subsidiary, affiliate, nonaffiliated corporation or other lawful business organization....

The Act also provides health care authorities with the power of eminent domain. Ala.Code § 22–21–319.

3. "Health care facility" is defined by the Act as:

Generally, any one or more buildings or facilities which serve to promote the public health, either by providing places or facilities for the diagnosis, treatment, care, cure or convalescence of sick, injured, physically disabled or handicapped, mentally ill, retarded or disturbed persons, or for the prevention of sickness and disease, or for the care, treatment and rehabilitation of alcoholics, or for the care of elderly persons, or for research with respect to any of the foregoing, including, without limiting the generality of the foregoing:

a. Public hospitals of all types, public clinics, sanitoria, public health centers and related public health facilities, such as medical or dental facilities, laboratories, out-patient departments, educational facilities, nurses' homes and nurses' training facilities, dormitories or residences for hospital personnel or students ...;

....

c. Appurtenant buildings and other facilities:

1. To provide offices for persons engaged in the diagnosis, treatment, care or cure of diseased, sick or injured persons, or in preventive medicine, or in the practice of dentistry; ...

....

f. Machinery, equipment, furniture and fixtures useful or desirable in the operation of any of the foregoing.

Ala.Code § 22–21–311(a)(13).

4. At the time this suit was filed, the proposed transaction essentially had been completed, save for the financing by the issuance of municipal bonds.

5. R.2 at 28.

heard on DCH/AMI's motion for summary judgment, plaintiffs filed for leave to amend the complaint to add the City of Northport as a party plaintiff and to include allegations that DCH should not receive immunity because it was acting pursuant to "private interests." After arguments were heard on the motion to dismiss or for summary judgment, plaintiffs moved for an extension to conduct discovery on the immunity issue, having failed to conduct any discovery up to that point. The district court denied the extension. Then, without written order, the district court denied DCH/AMI's motion to dismiss or for summary judgment, simply by stamping the motion "DENIED." DCH/AMI sought, and received, an expedited appeal.[6]

## II.

■ Before reaching the merits of this appeal, we address whether this court properly has jurisdiction under 28 U.S.C. § 1291.[7] Under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), district court orders constitute final decisions and are immediately reviewable if they (1) are effectively unreviewable on appeal after trial; (2) conclusively determine the disputed question; and (3) resolve an important issue completely separate from the merits. *Id.* at 546–47, 69 S.Ct. at 1225–26. In *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985), the Supreme Court specifically applied the rule of *Cohen*, known as the collateral order doctrine, to a decision by the district court to deny summary judgment on the grounds of qualified immunity.[8] This court then extended the holding in *Mitchell* to a decision by

the district court to deny state action immunity from antitrust liability, reasoning that because *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, "provide[s] '*immunity from suit* rather than a mere defense to liability,' ... the district court's decision ... is effectively unreviewable on appeal from a final judgment." *Commuter Transp. Systems, Inc. v. Hillsborough County*, 801 F.2d 1286, 1289 (11th Cir.1986) (quoting *Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815) (emphasis in *Mitchell*).

■ Plaintiffs contend that the district court did not issue a "final and reviewable" order by stamping "DENIED" on DCH/AMI's motion to dismiss or for summary judgment. This argument is foreclosed by *Hardin v. Hayes*, 957 F.2d 845, 848 (11th Cir.1992), where this court ruled that the district court's denial of summary judgment "without explanation" was sufficient to constitute a final and appealable order. Plaintiffs also argue that the district court "may have concluded that there are fact questions" precluding summary judgment on the issue of immunity.[9] *Commuter Transportation*, however, following *Mitchell*, held that the decision to deny summary judgment on an immunity issue, "even if it is based on the existence of potential fact issues[,] ... conclusively determines the defendant's claim of right not to stand trial on the plaintiff's allegations." 801 F.2d at 1289. In addition, the *Commuter Transportation* court recognized that questions relating to immunity are "'conceptually distinct from the merits of the plaintiff's claim.'" *Id.* at 1290 (quoting *Mitchell*, 472 U.S. at 528, 105 S.Ct. at 2816). Therefore, we conclude that the district court's denial of DCH/AMI's motion to dis-

**6.** One of the major reasons DCH sought an expedited appeal was because the suit had hampered its ability to issue the bonds necessary to complete the financing; the Municipal Bond Investors Assurance Corporation had declined to insure the bonds. By the time this court heard oral argument in the case, however, DCH had decided to go forward with the bond financing, without insurance, because interest rates were at a twenty-year low.

**7.** This section of the Judicial Code reads in part:

The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the

district courts of the United States ... except where a direct review may be had in the Supreme Court.
28 U.S.C. § 1291 (1982).

**8.** The Supreme Court recently affirmed these principles and extended them to other immunity situations. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, — U.S. —, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (holding that district court's decision regarding state's Eleventh Amendment immunity is a final and appealable order).

**9.** Pls.Amend.Br. at 11–12.

miss or for summary judgment is a final and appealable order under 28 U.S.C. § 1291 and *Cohen.*

### III.

In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, the Supreme Court held that the Sherman Act does not apply to the anticompetitive conduct of states acting as sovereigns. "Rather it ruled that the Sherman Act was intended to prohibit *private* restraints on trade, and it refused to infer an intent to 'nullify a state's control over its officers and agents' in activities directed by the legislature." *Town of Hallie*, 471 U.S. at 38, 105 S.Ct. at 1716 (quoting *Parker*, 317 U.S. at 351, 63 S.Ct. at 313) (emphasis in original). "Although 'cities are not themselves sovereign,' states may sanction cities' anticompetitive conduct, enshrouding the cities within the protective cloak of *Parker* immunity." *McCallum v. City of Athens*, 976 F.2d 649, 652 (11th Cir.1992) (quoting *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 412–13, 98 S.Ct. 1123, 1136–37, 55 L.Ed.2d 364 (1978)).

### A.

Ordinarily, when a local governmental entity seeks immunity from antitrust liability, it must show that it is a political subdivision of the state and that the challenged conduct is authorized under a "clearly articulated and affirmatively expressed" policy of the state. *Town of Hallie*, 471 U.S. at 41–47, 105 S.Ct. at 1717–20. Plaintiffs argue, however, that because DCH is not a city, town or village, the question of its immunity from antitrust liability should be analyzed under the two-prong test used to assess immunity for private parties acting pursuant to state regulation. This inquiry, developed in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), requires regulated private parties seeking antitrust immunity to show that (1) there is a "clearly articulated and affirmatively expressed" policy authorizing the challenged conduct; and (2) there is active state supervision of the private parties as part of the regulatory scheme. *Id.* at 105–06, 100 S.Ct. at 943.

*Town of Hallie*, as well as the case upon which it relied, *Lafayette*, 435 U.S. 389, 98 S.Ct. 1123, involved challenges to alleged anticompetitive conduct by municipalities. In holding "that the active state supervision requirement should not be imposed in cases in which the actor is a municipality," the *Town of Hallie* Court reasoned that "[w]here the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement." 471 U.S. at 46–47, 105 S.Ct. at 1720 (emphasis in original). Thus, as long as the municipality can prove that it is acting pursuant to state policy, "there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function." *Id.* at 47, 105 S.Ct. at 1720.

Plaintiffs contend, however, that the *Town of Hallie* Court recognized a distinction between municipalities and other political subdivisions of the state in that

> municipal conduct is invariably more likely to be exposed to public scrutiny than is private conduct. Municipalities in some states are subject to "sunshine" laws or other mandatory disclosure regulations, and municipal officers, unlike corporate heads, are checked to some degree through the electoral process. Such a position in the public eye may provide some greater protection against antitrust abuses than exists for private parties.

*Id.* at 45 n. 9, 105 S.Ct. at 1719 n. 9. This distinction, plaintiffs assert, is relevant here because DCH, as a health care authority, is not subject to those safeguards that ensure that a municipality is acting in the public interest. For example, DCH is not subject to Alabama open meetings or ethics laws nor are its officers publicly elected.

Despite the language in footnote 9, neither *Town of Hallie* nor any other Supreme Court or Eleventh Circuit case has held that a political subdivision that is not a municipality—i.e., a water authority, a transit authority, a public hospital corporation—is subject to the two-prong test of *Midcal.* In fact, several cases in this circuit have held that such authorities were immune from antitrust liability under the test enunciated in *Town of*

*Hallie. See, e.g., Commuter Transp.,* 801 F.2d at 1290 (transit authority); *Golta v. Greater Orlando Aviation Auth.,* 761 F.Supp. 778 (M.D.Fla.1991) (aviation authority); *Central Florida Clinic for Rehabilitation, Inc. v. Citrus County Hosp. Bd.,* 738 F.Supp. 459 (M.D.Fla.1989), *aff'd w'out op.,* 888 F.2d 1396 (11th Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990) (hospital corporation); *Sweeney v. Athens Regional Medical Center,* 705 F.Supp. 1556 (M.D.Ga.1989) (municipal health care authority); *Griffith v. Health Care Auth.,* 705 F.Supp. 1489 (N.D.Ala.1989) (health care authority organized under Alabama statute at issue in this case).[10] Most important, this court previously held that *DCH itself* is a political subdivision under Alabama law, and thus is subject to the "clearly articulated and affirmatively expressed" test of *Town of Hallie. Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1460–62 (11th Cir.1991).

The reasoning in *Todorov* is not affected, as plaintiffs contend, by the Supreme Court's recent decision in *Federal Trade Com'n v. Ticor Title Ins. Co.,* —— U.S. ——, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). *Ticor* deals with price fixing by loosely regulated private insurance companies. The issue before the Court was the nature of the state supervision involved. Despite the Court's strong language in *Ticor* that "a State may not confer antitrust immunity on private persons by fiat," *id.* at ——, 112 S.Ct. at 2176, the case simply is not applicable to entities that are political subdivisions of a state. In fact, this court ruled in a case decided after *Ticor* that a political subdivision receives antitrust immunity if it meets the *Town of Hallie* test; no second prong is imposed. *See Bolt v.*

*Halifax Hosp. Medical Center,* 980 F.2d 1381, 1385–87 (11th Cir.1993).

### B.

■ Even under the *Town of Hallie* test, plaintiffs maintain that DCH is not a political subdivision *for purposes of acquiring a privately-owned hospital.* In acquiring other health care facilities, plaintiffs contend, DCH is acting like a private party and the state legislature cannot immunize conduct that would be illegal if engaged in by private entities. They make this argument despite the plain language of the Act and this court's ruling in *Todorov,* 921 F.2d at 1460–62, that DCH is a political subdivision for purposes of antitrust immunity. Their argument fails.

As a basis for the power granted to DCH, as a health care authority, the Act specifically states:

> [It is] an expression of the public policy of the state with respect to the displacement of competition in the field of health care, that each authority, when exercising its powers hereunder with respect to the operation and management of health care facilities, acts as an agency or instrumentality of its authorizing subdivisions and as a political subdivision of the state.

Ala.Code § 22–21–318(c)(2). Plaintiffs contend that acquiring another hospital was not contemplated by the phrase "operation and management of health care facilities" and point to other sections of the Act that distinguish "acquiring" from "operating." For example, Alabama Code section 22–21–318(a)(5) states, in part, that health care authorities shall have the power:

10. Other circuits have held similarly. *See, e.g., Buckley Construction, Inc. v. Shawnee Civic & Cultural Development Auth.,* 933 F.2d 853 (10th Cir.1991) (public trust created pursuant to state statute); *Benton, Benton & Benton v. Louisiana Public Facilities Auth.,* 897 F.2d 198 (5th Cir. 1990) (state-created public utilities authority), *cert. denied,* —— U.S. ——, 111 S.Ct. 1619, 113 L.Ed.2d 717 (1991); *Consolidated T.V. Cable Service, Inc. v. City of Frankfort,* 857 F.2d 354 (6th Cir.1988) (city-created cable television corporation), *cert. denied,* 489 U.S. 1082, 109 S.Ct. 1537, 103 L.Ed.2d 842 (1989); *Sandcrest Outpatient Servs. v. Cumberland County Hosp. Systems, Inc.,* 853 F.2d 1139 (4th Cir.1988) (county hospital

corporation); *Boone v. Redevelopment Agency,* 841 F.2d 886 (9th Cir.) (statutorily-created municipal corporation), *cert. denied,* 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988); *Interface Group, Inc. v. Massachusetts Port Auth.,* 816 F.2d 9 (1st Cir.1987) (state-created port authority); and *Cine 42nd St. Theater Corp. v. Nederlander Org., Inc.,* 790 F.2d 1032 (2d Cir.1986) (statutorily-created development corporation); *but c.f., Tarabishi v. McAlester Regional Hosp.,* 951 F.2d 1558 (10th Cir.1991) (holding that hospital created as public trust is not a "special function governmental unit" for purposes of the Local Government Act of 1984), *cert. denied,* —— U.S. ——, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992).

[t]o acquire, construct, reconstruct, equip, enlarge, expand, alter, repair, improve, maintain, equip, furnish and operate health care facilities at such place or places, within or without the boundaries of its authorizing subdivisions and within and without the state, as it considers necessary or advisable.

See also supra note 2. If the Alabama legislature wanted to immunize health care authorities from antitrust liability for the acquisition of other hospitals, plaintiffs assert, it could have said so explicitly, as it did in other provisions of the Act.

The *Todorov* court, however, in holding that DCH is a political subdivision for purposes of antitrust immunity, did not make such distinctions. The court wrote:

It is apparent from this Act [Ala.Code § 22–21–210 et seq.] that the Alabama legislature made any hospital organized pursuant to the Act a local government entity, labeling such a hospital "a political subdivision of the state." DCH, as a hospital so organized, clearly qualifies as a local government entity. Thus, DCH will be immunized from antitrust liability if, pursuant to the dictate of *Town of Hallie*, it was acting as authorized by the state when it engaged in the allegedly anticompetitive behavior.

921 F.2d at 1461. In addition, in a case affirmed by this court, the district court in *Central Florida Clinic* ruled that a health care authority's power to "operate hospitals in the county" included the power to acquire a privately-owned health care facility. 738 F.Supp. at 462, *aff'd w'out op.*, 888 F.2d 1396 (11th Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990).

Furthermore, this court's recent decision in *McCallum*, 976 F.2d 649, forecloses plaintiffs' argument that DCH is not immunized from antitrust liability when it is "acting like a private party." In *McCallum*, the court affirmed the dismissal of plaintiff's Sherman Act claims against the City of Athens arising from Athens' operation of a for-profit waterworks. The court rejected plaintiff's argument that "the proprietary nature of Athens' waterworks" precluded state action immunity. Citing to the Supreme Court's decision

in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the *McCallum* panel held that there is no meaningful distinction for purposes of immunity between "governmental" and "proprietary" activities. 976 F.2d at 653 n. 7.

*McCallum* also rejected arguments, similar to those made by plaintiffs here, that the legislature of a state cannot "create immunity by fiat." The court wrote:

Of course, "the State may not validate a municipality's anticompetitive conduct simply by declaring it to be lawful." *Town of Hallie*, 471 U.S. at 39, 105 S.Ct. at 1716 (citing *Parker*, 317 U.S. at 351, 63 S.Ct. at 313). Yet, [the state] does not seek to declare lawful conduct that is not. Rather, [the state] expresses its state policy favoring municipal immunity from liability. Immunity does not alter the legal character of the immune act; it simply disallows recovery.

976 F.2d at 655 n. 9. *See also Columbia v. Omni Outdoor Advertising*, —— U.S. ——, 111 S.Ct. 1344, 1349–53, 113 L.Ed.2d 382 (1991) (holding that a governmental entity does not lose its state action immunity when its actions benefit private parties nor when its actions were motivated by proprietary interests); *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 804 F.Supp. 700, 710 (E.D.Pa.1992) (same).

### C.

■ Having shown itself to be a political subdivision for purposes of antitrust immunity, under *Town of Hallie* DCH now must prove that "it was acting as authorized by the state when it engaged in the allegedly anticompetitive behavior." *Todorov*, 921 F.2d at 1461. This authorization must be pursuant to "clearly expressed state policy." *Id.* at 1460. The dispute between the parties here is whether the Act authorizes DCH to acquire AMI, which is a privately-owned, public health care facility.

As described above, *see supra* note 2, the Act grants DCH broad powers (1) "[t]o acquire ... and operate health care facilities," Ala.Code § 22–21–318(a)(5); (2) "[t]o receive,

acquire, take and hold . . . real and personal property of every description, . . . and to manage, improve and dispose of the same," Ala.Code § 22–21–318(a)(7); and (3) "[t]o . . . acquire, operate or support subsidiaries and affiliates, either for profit or nonprofit, to assist such authority in fulfilling its purposes", Ala.Code § 22–21–358(4). The Act also grants DCH the power of eminent domain, which by definition can only be used to acquire *privately-owned* property. Ala.Code § 22–21–319. In addition, in describing the legislature's purpose in creating health care authorities, the Act states:

> It is therefore the intent of the legislature by the passage of this article to promote the public health of the people of this state . . . by authorizing the several counties and municipalities in the state effectively to form public corporations whose corporate purpose shall be to *acquire,* own and operate health care facilities. . . .

Ala.Code § 22–21–312 (emphasis added). "Health care facility" is broadly defined in the Act, and is specifically not limited to the examples given. *See supra* note 3.

DCH and AMI contend that AMI fits squarely within the definition of "health care facility" in that it is "one or more buildings or facilities which serve[s] to promote the public health." Ala.Code § 22–21–311(a)(13). In addition, AMI, it is argued, meets the first description given by that section in that it is a "public hospital"—that is, not a Veterans Administration hospital, health maintenance organization ("HMO") facility or other facility *not open to the general public.*

Plaintiffs rebut this argument by asserting that "public hospital" as described in section 22–21–311(a)(13) means "publicly-owned" as opposed to "privately-owned." In support of this argument, plaintiffs cite to the section of the Act dealing with legislative findings. There the Act states:

> Publicly-owned (as distinguished from investor-owned and community-nonprofit) hospitals and other health care facilities furnish a substantial part of the indigent and reduced-rate care services furnished to residents of the state by hospitals and other health care facilities generally.

Ala.Code § 22–21–312(1). From this passage, plaintiffs extrapolate that when the legislature stated that "health care facilities" included "public hospitals," it meant "publicly-owned hospitals"—that is, what makes the hospital public is the ownership, not the clientele. Thus, because AMI is a "privately-owned hospital"—despite the fact that it is open to the public—DCH's acquisition of it was outside the boundaries of its authorization.

Plaintiffs' argument is inconsistent with a common sense reading of the statute. The legislature clearly stated that, in its view, publicly-owned hospitals played a very significant role in providing health care to the poor. By establishing public health care authorities, it sought to enhance the amount and quality of service for Alabama's poor. If DCH could only purchase other publicly-owned hospitals, the overall number of publicly-owned facilities would not increase and service to the disadvantaged would remain the same. To the contrary, by purchasing AMI, DCH has increased the number of publicly-owned hospitals in the Tuscaloosa area, has expanded its ability to serve indigent care needs in the region, and has enhanced its ability to provide indigent and reduced-rate care at its existing facilities. This is entirely consistent with what the Alabama legislature authorized DCH to do.

### D.

The final step under *Town of Hallie* is for DCH to show that the anticompetitive nature of its actions was anticipated. *Town of Hallie,* 471 U.S. at 41–45, 105 S.Ct. at 1717–19; *McCallum,* 976 F.2d at 651–52. This standard is easily met here. The Act specifically states in section 22–21–318(a)(31) that a health care authority is to carry out its functions to the full extent of its powers,

> notwithstanding that as a consequence of such exercise of such powers[,] it engages in activities that may be deemed "anticompetitive" within the contemplation of the antitrust laws of the state or of the United States.

*See also* Ala.Code § 22–21–318(c).

This explicit recognition of the potential anticompetitive results goes well beyond

what is required for a political subdivision to show in order to gain state action immunity. In *Town of Hallie* itself, the legislature did not specifically include language anticipating—and condoning—anticompetitive conduct. Yet, the Supreme Court said that the statute at issue indicated that the legislature had foreseen that such conduct was the inevitable result of the city exercising the power authorized under the law. In addition, the Court cautioned against overly intrusive investigations into the legislative intent, "because it would embroil the federal courts in the unnecessary interpretation of state statutes." *Town of Hallie,* 471 U.S. at 44 n. 7, 105 S.Ct. at 1719 n. 7.

## IV.

For the foregoing reasons, we hold that DCH is immune from antitrust liability for its conduct relating to the purchase of AMI. Accordingly, we REVERSE the decision of the district court and REMAND the case to the district court for proceedings consistent with this opinion.