38 F.3d 1184
 63 USLW 2371, 1994-2 Trade Cases P 70,803
 FEDERAL TRADE COMMISSION, Plaintiff-Appellant,
v.
HOSPITAL BOARD OF DIRECTORS OF LEE COUNTY, d/b/a Lee
Memorial Hospital; West Coast Health System,
Inc.; Cape Coral Medical Center, Inc.,
Defendants-Appellees.
 No. 94-2642.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 30, 1994.
 
 David C. Shonka, Federal Trade Commission, Washington, DC, for appellant.
 Joe Sims and Thomas F. Cullen, Jr., Jones, Day, Reavis & Pogue, Washington, DC, for appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before HATCHETT and BLACK, Circuit Judges, and YOUNG*, Senior District Judge.
 BLACK, Circuit Judge:
 
 
 1
 The Federal Trade Commission (Commission) brings this antitrust action to prevent the Hospital Board of Directors of Lee County (Board), d/b/a Lee Memorial Hospital (Lee Memorial), from acquiring the assets of Cape Coral Medical Center, Inc., which owns and operates Cape Coral Hospital (CCH). The Commission alleges that the acquisition would violate federal antitrust laws by substantially lessening competition in the acute healthcare market. The Board alleges that the state action doctrine immunizes the acquisition from federal antitrust laws because the Florida Legislature foresaw possible anticompetitive effects when it gave the Board the implicit power to make acquisitions. The district court found that anticompetitive conduct was foreseeable and granted state action immunity to the Board. We affirm.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 2
 In 1963 a special act of the Florida Legislature created the Board as a non-profit public organization "to establish and to provide for the operation and maintenance of a public hospital" in Lee County. 1963 Fla.Spec.Laws ch. 63-1552 Sec. 1. The special act directed the Board to operate its facilities for "public and county purpose" and for "the use and benefit of the residents of Lee County." Id. at Secs. 7, 14. The Board's first act was building a new facility adjacent to the only hospital then in existence in Lee County. Once the new facility was completed, the Board acquired the assets and assumed the operations of the original hospital, now known as Lee Memorial, giving it 100% of the market share at that time. Today, Lee Memorial is a public, general, acute care hospital that holds 49% of the market share of the acute care inpatient hospital services in Lee County. It serves 80% of Lee County's Medicaid patients, 75% of the county's indigent patients, and 90% of the county's "penetrating trauma" patients.
 
 
 3
 In 1987, the Florida Legislature amended the Board's enabling legislation and extended the Board's power, allowing operation of additional hospitals in Lee County. The amendment authorized the Board to "establish and provide for the operation and maintenance of additional hospitals; satellite hospitals; clinics; or other facilities devoted to the provision of healthcare services...." Id. at Sec. 1, as amended by ch. 87-438, Sec. 1. The Board was also given the authority to
 
 
 4
 be a voting member of, choose directors to service on the boards of, be a partner in, or participate in or control, any venture, corporation, partnership, or other organization, public or private, which the hospital board finds operates for the purposes consistent with, and in furtherance of, the purposes and best interests of the hospital and other facilities created and authorized under this act.
 
 
 5
 Id. at Sec. 23, as amended by ch. 87-438, Sec. 7.
 
 
 6
 On March 31, 1994, the Board approved Lee Memorial's acquisition of CCH, a private, nonprofit hospital in Lee County. According to the Board, the acquisition would increase operating efficiencies and reduce expenditures of the two hospitals, alleviate CCH's current financial difficulties, and enable Lee Memorial and CCH, as one, to become an effective bidder for managed care contracts in Lee County.
 
 
 7
 On April 28, 1994, the Commission filed a complaint pursuant to Section 13(b) of the Federal Trade Commission Act (FTCA), 15 U.S.C. Sec. 53(b) (1988),[1] to prevent the Board from consummating the asset acquisition, which the Commission challenged as violative of Section 7 of the Clayton Act, 15 U.S.C. Sec. 18 (1988).[2] According to the Commission, the acquisition would be anticompetitive by reducing the number of hospitals in Lee County from four to three and by increasing Lee Memorial's market share in the county from 49% to 67%. The Commission thus maintains that Lee County consumers of acute care inpatient hospital services would be denied the benefits of free and open competition based on price, quality, and service.
 
 
 8
 On April 28, 1994, the district court entered a temporary restraining order blocking the acquisition. On May 10, the Board filed a motion to dismiss the case on the ground that the challenged acquisition was immunized under the state action doctrine. On May 16, treating the motion as one for summary judgment, the district court granted the motion without considering the actual anticompetitive impact of the acquisition. The district court found the Board immune under the state action doctrine, dissolved the temporary restraining order, and granted summary judgment.
 
 
 9
 The Commission filed a timely notice of appeal and a request for an injunction pending appeal. The request for an injunction was denied by the district court on May 17. On May 18, this Circuit granted the Commission's emergency motion for an injunction pending appeal and for an expedited appeal, construing the Commission's request as a motion for stay pending appeal of the district court's order of May 16, 1994.
 
 II. STANDARD OF REVIEW
 
 10
 The application of the state action doctrine is a question of law. The district court's grant of summary judgment is therefore subject to de novo review by the Circuit. See Bolt v. Halifax Hosp. Medical Ctr., 980 F.2d 1381, 1384 (11th Cir.1993) (citing Griesel v. Hamlin, 963 F.2d 338, 341 (11th Cir.1992); Morrison v. Washington County, Ala., 700 F.2d 678, 682 (11th Cir.), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983)).
 
 III. DISCUSSION
 
 11
 In Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court considered whether the Sherman Act prohibits anticompetitive conduct by a state. The petitioner sought to enjoin the California Director of Agriculture from enforcing a program adopted pursuant to the California Agricultural Prorate Act, which restricted the marketing of privately produced raisins. The statute was intended to restrict competition among agricultural producers in the state in order to stabilize prices and prevent economic waste. Id. at 353-55, 63 S.Ct. at 315.
 
 
 12
 Relying on principles of federalism and state sovereignty, the Court refused to apply the Sherman Act to the anticompetitive conduct of a state acting through its legislature. It reasoned that the purpose of the Sherman Act was to prohibit private restraints on trade, not to prohibit state action of a local nature intended to benefit the state's citizens. See id. at 349-53, 63 S.Ct. at 313-314. Thus, the Court concluded that the Sherman Act did not prohibit anticompetitive actions prescribed by the states "as an act of government." Id. at 351-53, 63 S.Ct. at 314.
 
 
 13
 The Parker doctrine protects the anticompetitive actions of the states from federal antitrust laws. It does not apply directly to a state's political subdivisions because these subdivisions "are not themselves sovereign; they do not receive all the federal deference of the States that create them." City of Lafayette, La. v. Louisiana Power & Light Co., 435 U.S. 389, 412, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978). However, the Supreme Court applied the Parker doctrine, with some modifications, to the anticompetitive actions of political subdivisions in Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). To obtain state action immunity, an entity, such as the Board, must show the following: (1) that it is a political subdivision of the state; (2) that, through statutes, the state generally authorizes the political subdivision to perform the challenged action; and (3) that, through statutes, the state has clearly articulated a state policy authorizing anticompetitive conduct. See id.
 
 
 14
 A. The Board is a Political Subdivision of the State of Florida
 
 
 15
 The district court found, and the Commission does not contest, that the Board is a political subdivision of the State of Florida. In Hallie, the Supreme Court left open the question of whether a state agency, such as a healthcare authority, can be immune from federal antitrust laws under the state action doctrine absent some state supervision. Nevertheless, in Askew v. DCH Regional Health Care Authority, 995 F.2d 1033 (11th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 603, 126 L.Ed.2d 568 (1993), this Circuit held that a healthcare authority created by the Alabama Legislature was a political subdivision of the state. Here, the Board is a healthcare authority created by the Florida Legislature as a special purpose unit of local government. 1963 Fla.Spec.Laws ch. 63-1552 Sec. 1. The Board, therefore, satisfies the first criteria of state action immunity required for political subdivisions.
 
 
 16
 B. The Board is Authorized to Acquire Another Hospital
 
 
 17
 The Commission concedes, and we agree, that the Board is empowered and authorized by the State of Florida to engage in the proposed acquisition. The Florida Legislature granted the Board extensive authority to operate, control, and maintain a public hospital and other hospital facilities in Lee County. Thus, the Board's power under state law to engage in the proposed transaction is not at issue.
 
 
 18
 C. The Alleged Anticompetitive Effects of the Acquisition Were Foreseeable
 
 
 19
 The parties have stipulated, and we agree, that the Board is a political subdivision of the state and that the acquisition was authorized by the state. The only issue on appeal, therefore, is whether the allegedly anticompetitive acquisition is undertaken by the Board pursuant to a clearly articulated state policy to authorize anticompetitive conduct. The Supreme Court and this Circuit have rejected the concept that a clear articulation requires the state to state explicitly that it expects anticompetitive conduct to result from legislation. Hallie, 471 U.S. at 41-43, 105 S.Ct. at 1718; Askew, 995 F.2d at 1040-1041. Instead, a clear articulation merely requires that anticompetitive conduct is the foreseeable result of the legislation. Hallie, 471 U.S. at 41-43, 105 S.Ct. at 1718. In this case, the district court found that the allegedly anticompetitive effects of the proposed acquisition were the foreseeable result of the powers given to the Board by the Florida Legislature.
 
 1. The Parties' Contentions
 
 20
 The Commission contends that a foreseeable anticompetitive effect is one that ordinarily occurs, routinely occurs, or is inherently likely to occur as a result of the empowering legislation. It also seeks to place restrictive conditions on the application of the Hallie foreseeability standard.[3]
 
 
 21
 The Board rejects the definition suggested by the Commission. In contrast, the Board suggests that foreseeability should be interpreted in light of its plain meaning and common sense. The Board, therefore, argues that an anticompetitive effect is one which can reasonably be anticipated to result from the powers granted by the state and that no further conditions are required to satisfy the foreseeability element of the state action doctrine.
 
 
 22
 2. The Interpretation of the Foreseeability Standard
 
 
 23
 The Board's position is supported by the holding of the Supreme Court in Hallie, and by subsequent holdings of this Circuit. In Hallie, a number of unincorporated townships alleged that the City of Eau Claire violated the Sherman Act by monopolizing the area's sewage treatment services and refusing to provide sewage treatment to certain areas unless the landowners in those areas voted to be annexed by the City. The City claimed Parker immunity based on a statute that granted cities the authority to develop sewage systems and to "describe with reasonable particularity the district to be [served]." Hallie, 471 U.S. at 41, 105 S.Ct. at 1717 (quoting Wis.Stat. Sec. 62.18(1) (1981-1982)). This statute was supplemented to provide that a city operating a public utility "may by ordinance fix the limits of such service in unincorporated areas. Such ordinance shall delineate the area within which service will be provided and the municipal utility shall have no obligation to serve beyond the area so delineated." Id. (quoting Wis.Stat. Sec. 66.069(2)(c) (1981-1982)).
 
 
 24
 The Court acknowledged that Parker immunity applies to a city's anticompetitive behavior sanctioned by a clearly expressed state policy but sought to determine just how clearly expressed that state policy must be. The Court found that "clearly expressed" does not require the legislature to explicitly state that the political subdivision may engage in anticompetitive activities. Id. 471 U.S. at 41-43, 105 S.Ct. at 1718. Rather, it simply requires that the anticompetitive conduct be a foreseeable result of the powers granted to the political subdivision. Id. Applying this standard in Hallie, the Court noted that:
 
 
 25
 [T]he statutes clearly contemplate that a city may engage in anticompetitive conduct. Such conduct is a foreseeable result of empowering the City to refuse to serve unannexed areas. It is not necessary ... for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects.... [Rather,] it is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from the broad authority to regulate.
 
 
 26
 Id.
 
 
 27
 This Circuit applied the Hallie foreseeability standard and granted state action immunity in a case which involved facts and legislation similar to those in the instant case. Askew v. DCH Regional Health Care Auth., 995 F.2d 1033 (11th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 603, 126 L.Ed.2d 568 (1993). In Askew, DCH, a public healthcare facility created by the State of Alabama, sought to expand through acquisition of a private healthcare facility. The Circuit held that the proposed acquisition was immune from antitrust scrutiny because the displacement of competition was foreseeable at the time the legislature gave DCH the power to acquire other hospitals.
 
 In Askew, the DCH was authorized to
 
 28
 acquire, construct, reconstruct, equip, enlarge, expand, alter, repair, improve, maintain, equip, furnish, and operate health care facilities.
 
 
 29
 Id. at 1034 n. 2 (quoting Ala.Code Sec. 22-21-318). In this case, the Florida Legislature gave the Board the power to
 
 
 30
 establish and provide for the operation and maintenance of additional hospitals; satellite hospitals; clinics; or other facilities devoted to the provision of healthcare services.
 
 
 31
 . . . . .
 
 
 32
 1963 Fla.Spec.Laws ch. 63-1552 Sec. 1, as amended by ch. 87-438, Sec. 1. The Alabama Legislature also authorized the DCH to
 
 
 33
 create, establish, acquire, operate or support ... subsidiaries and affiliates, either for profit or nonprofit.
 
 
 34
 Askew, 995 F.2d at 1035 n. 2 (quoting Ala.Code Sec. 22-21-358). The Florida Legislature also authorized the Board to
 
 
 35
 create, be a voting member of, choose directors to serve on the boards of, be a partner in, or participate in or control, any venture, corporation, partnership, or other organization, public or private, which the [Board] finds operates for the purposes consistent with, and in furtherance of, the purposes and best interests of the hospital and other facilities created and authorized under this act.
 
 
 36
 1963 Fla.Spec.Laws ch. 63-1552 Sec. 23, as amended by ch. 87-438 Sec. 7.
 
 
 37
 The enabling legislation in Askew did give DCH the power to exercise its powers "notwithstanding that as a consequence of such exercise of such powers it engages in activities that may be deemed 'anticompetitive.' " Askew, 995 F.2d at 1040 (quoting Ala.Code Sec. 22-21-318(a)(31)). The Circuit stressed, however, that the Alabama Legislature's explicit recognition of potential anticompetitive results went well beyond what was required in order to render those results foreseeable. Moreover, the Circuit reiterated that Hallie had recognized foreseeability in the absence of express authority to engage in anticompetitive conduct. Id. at 1041. In other cases subsequent to Hallie, this Circuit has found that anticompetitive acts not explicitly authorized by statute were also foreseeable.
 
 
 38
 In Central Florida Clinic for Rehabilitation, Inc. v. Citrus County Hospital Board, 738 F.Supp. 459 (M.D.Fla.), aff'd without opinion, 888 F.2d 1396 (11th Cir.1989), cert. denied, 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990), the Circuit affirmed the district court's application of Parker immunity. The district court determined that the power to operate hospitals and perform related services made it foreseeable that the public hospital board would monopolize the market for provision of outpatient services.[4] The district court recognized that "[t]he precise anticompetitive conduct of the Board that plaintiff challenges in this action is the Board's alleged attempt to be the sole provider in Citrus County of ancillary health care services; specifically, occupational and speech therapy services on an outpatient basis." Id. at 462. Although the enabling legislation in Central Florida did not address ancillary services, the district court nonetheless pointed to the fact that "the statutory authority [of the Board] is broad and expansive within a specified field and for a particular purpose" and "may be fairly construed to contemplate that the Board might displace competition for outpatient services in Citrus County." Id. at 464. It can hardly be said that the monopolization of ancillary services was the inevitable result, or even the ordinary or routine outcome, of granting the Citrus County Hospital Board the general power to operate, own, and acquire other public hospitals.
 
 
 39
 Likewise, in Bolt v. Halifax Hospital Medical Center, 980 F.2d 1381 (11th Cir.1993), the Circuit held that a statute authorizing a hospital to conduct peer review rendered it foreseeable that the hospital would engage in an anticompetitive boycott of certain physicians. Id. at 1386-87 (quoting Bolt v. Halifax Hosp. Medical Ctr., 891 F.2d 810, 825 (11th Cir.), cert. denied, 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990)). The Circuit further held that, in "granting [the hospital board] the virtually unreviewable power to hire (or not hire) 'agents and employees as may be advisable,' the Florida legislature clearly articulated a policy to displace competition." Id. at 1386 (quoting Bolt, 891 F.2d at 825). Again, the anticompetitive outcome in Bolt was not the inevitable, or even the routine or ordinary result of the power to conduct a peer review.
 
 
 40
 The Circuit has also immunized conduct in industries other than healthcare where the anticompetitive conduct was within the range of reasonable possibilities contemplated by the legislature, even if it was not routine, ordinary, or inevitable. See, e.g., Commuter Transp. Sys. Inc. v. Hillsborough County Aviation Auth., 801 F.2d 1286 (11th Cir.1986) (statute granting political subdivision the power to develop and administer public airports in the Tampa area rendered foreseeable the anticompetitive result of the political subdivision's limitations on ground transportation permitted to pick up passengers at the airport).
 
 
 41
 By attempting to impose a narrow definition on the term "foreseeable," the Commission essentially seeks a bright line test which turns the test of foreseeability into a test of inevitability, falling just short of requiring the state to expressly indicate its intention to displace competition. However, in Central Florida, Bolt, and Commuter Transportation, the Circuit has required only that the anticompetitive conduct be reasonably anticipated, rather than the inevitable, ordinary, or routine outcome of a statute. The allegedly anticompetitive conduct by the Board in this case was just as reasonably anticipated as the anticompetitive conduct in Central Florida, Bolt, and Commuter Transportation.
 
 
 42
 The Commission makes several other arguments in an effort to condition the application of the foreseeability standard on certain factors,[5] but we find those arguments unpersuasive in light of the evolution of the foreseeability standard. Parker recognized that the state action doctrine is intended to preserve the rights of a state to provide for the well being of its citizens on a local level without being burdened by federal antitrust laws. Hallie and Askew recognized that a state can exercise this right through its political subdivisions and rejected the state's obligation to expressly state its intention to displace competition in order to render anticompetitive conduct foreseeable. Logically following this recognition, we reject the suggestion that, in order to render anticompetitive conduct foreseeable, a state must enact either specific legislation from which anticompetitive conduct must ordinarily or routinely occur or specific legislation creating regulatory or monopolistic powers. No such bright line definition or condition has ever been embraced by the Supreme Court or by this Circuit.
 
 
 43
 Further, applying the foreseeability test in the manner suggested by the Commission could restrict the concepts of federalism and state sovereignty, which were emphasized in Parker. These concepts are particularly important to the instant case, in which the Florida Legislature implicitly gave the Board the power to acquire other hospitals in an effort to provide low-cost healthcare primarily to indigent citizens of Lee County. Therefore, we agree with the Board that a foreseeable anticompetitive effect is one that can reasonably be anticipated to result from the powers granted to a political subdivision by the state.[6]
 
 
 44
 3. Foreseeability Applied to the Instant Case
 
 
 45
 In order to determine whether the allegedly anticompetitive effects of the proposed acquisition were reasonably anticipated by the Florida Legislature, we must consider the context in which the instant legislation was enacted. In so doing, we recognize that Hallie cautioned against overly intrusive investigations into legislative intent, and we make no attempt to divine such intent in our analysis. However, a foreseeability analysis cannot be done in isolation. To determine if specific anticompetitive consequences were foreseeable, we must examine what the legislature knew about the market and the community at the time the legislation was enacted. See Leo Sheep Co. v. United States, 440 U.S. 668, 669-71, 99 S.Ct. 1403, 1405, 59 L.Ed.2d 677 (1979) ("courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it." (quoting United States v. Union Pacific R. Co., 91 U.S. 72, 23 L.Ed. 224 (1875))).
 
 
 46
 In 1963, when the Board was originally created, there was only one hospital in existence in Lee County. Pursuant to the powers given it, the Board acquired the hospital, creating a monopoly. In 1987, the legislature, with the knowledge that it had given the Board the power to create a monopoly in 1963, further expanded the implicit power of the Board to acquire other hospitals. Thus, if the legislature knew at the time it expanded the Board's acquisition powers in 1987 that a monopoly had resulted from the 1963 legislation, the legislature must have reasonably anticipated that further acquisitions, resulting from the 1987 legislation, would increase the Board's market share in an anticompetitive manner. See Oldham v. Rooks, 361 So.2d 140 (Fla.1978) (holding that there is a general presumption that the Florida Legislature passes statutes with knowledge of other laws it is passing or has enacted).
 
 
 47
 Further, in 1987, the same year that the Florida Legislature amended the Board's authority, it also enacted the Health Facility and Services Development Act, Fla.Stat.Ann. Secs. 408.031-408.045, which requires a Certificate of Need (C.O.N.) from the State of Florida in order to construct new hospital facilities. The State can grant the C.O.N. only if there is a need for new hospitals or facilities in a specific area. Id. at Sec. 408.035. This legislation makes it more difficult for any new hospital to enter the market or for any existing hospital to obtain the state's authorization to construct new hospital facilities. In 1987, Lee County was at less than 75% capacity of licensed acute care inpatient beds and there was no need for additional beds in Lee County. Thus, because the authorizing legislation limited the Board to operating within Lee County and because market conditions would not justify C.O.N. authority to add new facilities, the acquisition of one of the three competing hospitals in Lee County was a foreseeable result of the Florida Legislature's granting the Board the authority to add new facilities to its operation. Clearly, anticompetitive conduct was reasonably anticipated.
 
 IV. CONCLUSION
 
 48
 The Board's allegedly anticompetitive conduct could have been reasonably anticipated by the Florida Legislature when it gave the Board the implicit power to acquire other hospitals and was, therefore, a foreseeable consequence of the legislature's delegation of power to the Board. Having concluded that the allegedly anticompetitive results were foreseeable under the state action doctrine, it is unnecessary to determine whether the acquisition violates the Clayton Act. Thus, we affirm the district court's holding that the state action doctrine immunizes the Board's proposed acquisition of CCH from federal antitrust laws.
 
 
 49
 AFFIRMED.
 
 
 
 *
 Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation
 
 
 [1]
 Section 13(b) of the FTCA provides, in pertinent part:
 Whenever the Commission has reason to believe--
 (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the ... Commission, and
 (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public--
 the Commission ... may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond....
 
 
 [2]
 Section 7 of the Clayton Act provides, in pertinent part:
 No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the [Commission] shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.
 
 
 [3]
 Although the Commission seeks a narrow definition of the term "foreseeable," it concedes, as it must, that the Legislature need not explicitly state that it expected the Board to engage in anticompetitive conduct in order to render the Board's allegedly anticompetitive conduct foreseeable
 
 
 [4]
 Specifically, Florida authorized the hospital board to "operate public hospitals and nursing and convalescent homes" and "to build, erect, expand, equip, maintain, operate, alter, change, lease and repair" such facilities, as well as to own and acquire property. Id. at 462 (citations omitted)
 
 
 [5]
 For example, the Commission contends that the anticompetitive behavior of a political subdivision acting as a private party is not a foreseeable effect of legislation which grants authority to that political subdivision. However, this Circuit's recent decision in McCallum v. City of Athens, Ga., 976 F.2d 649 (11th Cir.1992), undercuts the Commission's argument. In McCallum, the Circuit affirmed the dismissal of Sherman Act claims against the City of Athens arising from Athens' operation of a for-profit water works. The Circuit rejected the argument that "the proprietary nature of Athens' waterworks preclude[d] ... state action immunity." Id. at 653 n. 7. Citing to the Supreme Court's decision in Garcia v. San Antonio Metropolitan Transit Auth., 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the McCallum panel held that there is no meaningful distinction for purposes of immunity between "governmental" and "proprietary" activities. Thus, assuming that the Board was given powers to act exactly as private hospitals would act, the Board's anticompetitive conduct is not beyond the reach of Parker immunity, nor is the anticompetitive conduct per se unforeseeable
 The Commission also contends that, in the absence of an express grant of authority to engage in anticompetitive conduct, the state must grant the Board either regulatory powers or the power to be a monopoly public service. We reject this argument because, although the language of Hallie mentioned "regulation" and "monopolies," neither the Court in Hallie nor this Circuit has ever found that a state has a binary choice between using regulation or monopoly public service in order to render a political subdivision's anticompetitive conduct foreseeable. See, e.g., Bolt, 980 F.2d 1381; Commuter Transp., 801 F.2d 1286.
 
 
 [6]
 We recognize that there must be some showing that the anticompetitive results were more than merely "plausible." FTC v. University Health Inc., 938 F.2d 1206, 1213 n. 13 (11th Cir.1991). However, University Health differs from the instant case because, in that case, the hospitals attempting to engage in an anticompetitive merger sought state action immunity based solely in Georgia's Certificate of Need (C.O.N.) statute. The hospital claimed that the C.O.N. statute, which restricted hospital entry into the market, showed a state regulatory policy to displace and suppress competition. The Circuit dismissed the argument because it found that Georgia's C.O.N. statute, by itself, did not render the suppression of competition in the form of a merger foreseeable