[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 9, 2011
JOHN LEY
CLERK

No. 11-12906
_____

D.C. Docket No. 1:11-cv-00058-WLS

FEDERAL TRADE COMMISSION,

Plaintiff - Appellant,

STATE OF GEORGIA,

Plaintiff,

versus

PHOEBE PUTNEY HEALTH SYSTEM, INC.,
PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.,
PHOEBE NORTH, INC.,
HCA, INC.,
PALMYRA PARK HOSPITAL, INC.,
HOSPITAL AUTHORITY OF ALBANY - DOUGHERTY COUNTY,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(December 9, 2011)

Before TJOFLAT and CARNES, Circuit Judges, and MICKLE,[*] District Judge.

TJOFLAT, Circuit Judge:

## I.

## A.

In 1941, the Georgia legislature enacted the Hospital Authorities Law, 1941 Ga. Laws 241 (codified as amended at O.C.G.A. § 31-7-70 et seq.). That statute creates a hospital authority, "a public body corporate and politic," for each city and county, O.C.G.A. § 31-7-72(a), or for multiple cities or counties combined, id. § 31-7-72(d). The hospital authority does not become operative, however, unless the governing body of the city or county determines that the authority is needed for the delivery of hospital services. Id. § 31-7-72(a). Once such need is determined, the governing body appoints between five and nine individuals to manage the authority. Id.

Each authority is given broad powers to meet the public health needs of its community. Among those specified by the statute are the powers to "operate projects," id. § 31-7-75(4), which include hospitals, clinics, nursing homes, and

---

[*] Honorable Stephan P. Mickle, United States District Judge for the Northern District of Florida, sitting by designation.

other public health facilities, id. § 31-7-71(5);[1] to "acquire by purchase, lease, or otherwise . . . projects," id. § 31-7-75(4); to "construct, reconstruct, improve, alter, and repair projects," id. § 31-7-75(5); to "lease . . . for operation by others any project," id. § 31-7-75(7); to "establish rates and charges for the services and use of the facilities of the authority," id. § 31-7-75(10); to "exchange, transfer, assign, pledge, mortgage, or dispose of any real or personal property or interest therein," id. § 31-7-75(14); and to "form and operate, either directly or indirectly, one or more networks of hospitals, physicians, and other health care providers and to arrange for the provision of health care services through such networks," id. § 31-7-75(27).

The statute also grants the authorities more general powers to "make plans for unmet needs of their respective communities," id. § 31-7-75(22), to "make and execute contracts and other instruments necessary to exercise the[ir] powers," id. § 31-7-75(3), and to "exercise any or all powers now or hereafter possessed by private corporations performing similar functions," id. § 31-7-75(21).  And, the statute makes clear, these enumerated powers—broad as they are—are not exhaustive: each authority has "all the powers necessary or convenient to carry out

---

[1] An authority may not, however, "operate or construct any project for profit."  O.C.G.A. § 31-7-77.

3

and effectuate the purposes and provisions of this article." Id. § 31-7-75.[2]

<h2 style="text-align:center">B.[3]</h2>

In 1941, the City of Albany and Dougherty County (in which the City is located) determined the need for a hospital authority in Dougherty County and established the Hospital Authority of Albany–Dougherty County (the "Authority"). After it was formed, the Authority acquired Phoebe Putney Memorial Hospital in Albany ("Memorial"). Until 1990, the Authority operated Memorial. That year, however, the Authority exercised its § 31-7-75(7) power to lease the facility for operation by others; to such end, it formed two nonprofit corporations, Phoebe Putney Health System, Inc. ("PPHS") and, as a PPHS subsidiary, Phoebe Putney Memorial Hospital, Inc. ("PPMH"), and leased

---

[2] Each authority's exercise of these powers, however, is generally limited to its own city or county, or, under limited circumstances, only slightly beyond those boundaries. The statute defines an authority's "[a]rea of operation" as "the area within the city or county activating an authority," as well as "any other city or county in which the authority wishes to operate, provided the governing authorities and the board of any hospital authorities of such city and county request or approve such operation." Id. § 31-7-71(1). And the statute's definition of "project" suggests that an operation qualifies as a project only if it falls within the city or county in which the authority is located, within the authority's area of operation, or within a city or county whose governing bodies and hospital authority have approved the project. See id. § 31-7-71(5). An authority in a low-population county, however, may locate a project in a county contiguous to its area of operation. Id. § 31-7-89.1(d). The statute also sometimes allows projects as far as 12 miles from the city or county in which an authority is located. Id. § 31-7-72(f).

[3] The facts set out in subpart B are as reflected in the complaint in this case and are not materially disputed. In reciting the provisions of the Hospital Authorities Law we took judicial notice of such provisions.

4

Memorial to PPMH.[4]  Since 1990, PPMH has been operating the hospital.

PPMH's lease gives it the right to set the prices for the services Memorial provides.  In exercising such right, however, PPMH is subject to the Hospital Authorities Law's proscription against charging prices greater than necessary to cover the cost of the services and provide reasonable reserves.  See id. § 31-7-77.

Memorial consists of 443 beds and offers, among other things, a full range of inpatient general acute-care services.  Memorial's (and thus PPHS's and PPMH's) only real competitor is Palmyra Park Hospital, Inc. ("Palmyra"), a subsidiary of HCA, Inc. established in Albany in 1971.[5]  Palmyra consists of 248 beds and provides essentially the same services as Memorial.  Memorial controls 75 percent and Palmyra 11 percent of their geographic market.[6]

In December 2010, PPHS presented the Authority with a plan to acquire Palmyra's assets, i.e., the Palmyra hospital facility, with funds provided by PPHS[7]

---

[4] The Authority's contractual arrangement with PPMH and PPHS provides that, upon the termination or expiration of the lease to PPMH, both PPMH and PPHS are to be dissolved and their assets are to revert to the Authority.

[5] HCA, Inc. is a for-profit corporation that operates hospitals in twenty states.

[6] The geographic market for Memorial and Palmyra consists of Dougherty and five surrounding counties.

[7] PPHS would provide $195 million, and the Authority would use such funds to purchase Palmyra's assets.  If the plan were not carried to fruition, PPHS would pay HCA, Inc. a fee of $35 million.

5

and to lease such assets to PPHS or a nonprofit PPHS subsidiary. The terms of the lease would be essentially the same as the Authority's PPMH lease.[8] The Authority approved the plan to the extent that it called for the purchase of the Palmyra hospital and its temporary management by a subsidiary to be established by PPHS. In April 2011, the Authority approved the terms of the proposed lease to PPHS or its subsidiary.

## II.

On April 19, 2011, the Federal Trade Commission (the "Commission") initiated an administrative proceeding to determine whether the Authority's purchase of Palmyra and subsequent lease to PPHS, or a PPHS subsidiary, would substantially lessen competition or tend to create a monopoly in the inpatient general acute-care hospital services market in Dougherty County and surrounding areas (the "relevant market") in violation of section 7 of the Clayton Act, 15 U.S.C. § 18. See 15 U.S.C. § 21(a) (granting the Commission authority to enforce section 7 of the Clayton Act). Section 7 provides that "no person subject to the jurisdiction of the [Commission] shall acquire . . . the assets of another . . . where

---

[8] The plan called for the cancellation of PPMH's Memorial lease and the execution of an instrument under which the Authority would lease both Memorial and Palmyra to PPHS or a PPHS subsidiary for a term of 40 years. Prior to the execution of this lease, the Authority would contract with a newly organized PPHS subsidiary, Phoebe North, Inc., to operate Palmyra.

6

. . . the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. According to the Commission, the proceeding was to be held in September 2011. If a section 7 violation were to be found, the Commission would issue a cease and desist order to prevent the Authority going forward with the plan to acquire the Palmyra hospital facility. The order would be subject to review in this court. 15 U.S.C. § 45(c) ("Any person, partnership, or corporation required by an order of the Commission to cease and desist . . . may obtain a review of such order in the [appropriate circuit] court of appeals of the United States.").

To prevent the consummation of the plan prior to the completion of the administrative proceeding, FTC v. Univ. Health, Inc., 938 F.2d 1206, 1217 n.23 (11th Cir. 1991) ("[O]nce an anticompetitive acquisition is consummated, it is difficult to 'unscramble the egg.'"), the Commission brought this action, on April 20, 2011, to obtain a preliminary injunction against the Authority, PPHS, PPMH, HCA, Inc., and Palmyra (collectively "Appellees"). See 15 U.S.C. § 53(b) ("Whenever the Commission has reason to believe (1) that any person, partnership, or corporation is violating, or is about to violate [section 7] . . . the Commission . . . may bring suit in a district court of the United States to enjoin any

7

such act."). In order to demonstrate its likelihood of prevailing on the merits,[9] the Commission alleged that the Authority's purchase of Palmyra would create a monopoly in the relevant market.

The Appellees, in response, moved the district court to dismiss the Commission's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. They did not contest the Commission's claim that the acquisition of Palmyra and effective merger of Palmyra and Memorial would tend to create, if not actually create, a monopoly in the relevant market. Instead, they asserted that the "state-action doctrine" immunized the Authority and its operation of the two hospitals under the planned arrangement with PPHS from antitrust liability. The district court agreed that the Authority, PPHS, and PPMH were entitled to such immunity and dismissed the Commission's complaint with prejudice. The Commission now appeals.

## III.

We review <u>de novo</u> a district court's order dismissing a complaint under Rule 12(b)(6). <u>Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease</u>

---

[9] Section 13(b) of the Federal Trade Commission Act allows courts to grant a preliminary injunction against defendants in an action brought by the Commission provided there is a "proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, [granting the injunction] would be in the public interest." 15 U.S.C. § 53(b).

8

Control & Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010). We "accept[] the factual allegations in the complaint as true and construe[] them in the light most favorable to the plaintiff," id.; we are not, however, "bound to accept as true a legal conclusion couched as a factual allegation," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007) (quoting Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944, 92 L. Ed. 2d 209 (1986)).

We agree with the Commission that, on the facts alleged, the joint operation of Memorial and Palmyra would substantially lessen competition or tend to create, if not create, a monopoly. The question, then, is whether this anticompetitive conduct is immunized by the state-action doctrine.

## A.

The doctrine of state-action immunity protects the states from liability under the federal antitrust laws. In Parker v. Brown, 317 U.S. 341, 63 S. Ct. 307, 87 L. Ed. 315 (1943), the Supreme Court held that the Sherman Act did not subject the states to liability for anticompetitive conduct within their jurisdiction. Id. at 352, 63 S. Ct. at 314. Relying on principles of federalism, the Court refused to find in the antitrust laws "an unexpressed purpose to nullify a state's control over its officers and agents." Id. at 351, 63 S. Ct. at 313.

The same protection does not, however, extend automatically to

9

municipalities or political subdivisions of the states. Political subdivisions, as the Supreme Court has explained, "are not themselves sovereign; they do not receive all the federal deference of the States that create them." City of Lafayette v. La. Power & Light Co., 435 U.S. 389, 412, 98 S. Ct. 1123, 1136, 55 L. Ed. 2d 364 (1978) (plurality opinion). But because political subdivisions are "instrumentalities of the State," id. at 413, 98 S. Ct. at 1137 (quoting Louisiana ex rel. Folsom v. Mayor of New Orleans, 109 U.S. 285, 287, 3 S. Ct. 211, 213, 27 L. Ed. 936 (1883)), they may under some circumstances be entitled to state-action immunity. Thus, a political subdivision, like the Authority,[10] enjoys state-action immunity if it shows that, "through statutes, the state generally authorizes [it] to perform the challenged action" and that, "through statutes, the state has clearly articulated a state policy authorizing anticompetitive conduct." FTC v. Hosp. Bd. of Dirs. of Lee Cnty., 38 F.3d 1184, 1187–88 (11th Cir. 1994) (citing Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S. Ct. 1713, 85 L. Ed. 2d 24 (1985)).

The requirement of a clearly articulated state policy, as the Supreme Court explained in Town of Hallie, does not require the state legislature to "expressly

_____

[10] We held in Crosby v. Hospital Authority of Valdosta and Lowndes County, 93 F.3d 1515 (11th Cir. 1996), that a hospital authority created by the Georgia Hospital Authorities Law, O.C.G.A. § 31-7-70 et seq., was, for purposes of state-action immunity, a political subdivision of the state. 93 F.3d at 1525.

state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." 471 U.S. at 43, 105 S. Ct. at 1719. Instead, it is enough that such anticompetitive conduct is a "foreseeable result" of the legislation. Id. at 42, S. Ct. at 1718. And, as we explained in Lee County, a "foreseeable anticompetitive effect" need not be "one that ordinarily occurs, routinely occurs, or is inherently likely to occur as a result of the empowering legislation." 38 F.3d at 1188. The clear-articulation standard "require[s] only that the anticompetitive conduct be reasonably anticipated." Id. at 1190–91.

## B.

The Authority's immunity therefore turns on whether the state has authorized the Authority's acquisition[11] of Palmyra and, in doing so, clearly articulated a policy to displace competition.[12] See Town of Hallie, 471 U.S. at 40,

---

[11] For purposes of our state-action analysis, we consider all the anticipated stages of the plan approved by the Authority—the purchase of Palmyra's assets, as well as their temporary management by, and subsequent lease to, PPHS or a PPHS subsidiary—as parts of a single "acquisition" under the Clayton Act.

[12] The Commission would have us approach the state-action issue differently. It argues that this case involves no "genuine state action" at all. Appellant's Br. 24. According to the Commission, the challenged plan is, in substance, a transfer of control of a hospital from one private party to another—a transfer engineered by a private party and only rubber-stamped by a governmental entity. In the absence of genuine state action, the Commission insists, we can dispose of the immunity issue without even reaching the question whether the state authorized the transaction and clearly articulated a policy to displace competition.

The Supreme Court's decision in City of Columbia v. Omni Outdoor Advertising, Inc.,

11

105 S. Ct. at 1717. That standard, as explained above, is satisfied as long as anticompetitive consequences were a foreseeable result of the statute authorizing the Authority's conduct. We conclude that in this case that standard is met.

The Hospital Authorities Law, O.C.G.A. § 31-7-70 et seq., evidently contemplates anticompetitive effects, including just the sort of anticompetitive conduct challenged here. Through that law, the Georgia legislature granted powers of impressive breadth to the hospital authorities. Those powers include the powers to "operate projects," id. § 31-7-75(4), which include hospitals, id. § 31-7-71(5); to "construct, reconstruct, improve, alter, and repair projects," id. § 31-7-75(5); to "establish rates and charges for the services and use of the facilities of the authority," id. § 31-7-75(10); to "sue and be sued," id. § 31-7-75(1); to "exchange, transfer, assign, pledge, mortgage, or dispose of any real or personal property or interest therein," id. § 31-7-75(14); and to "borrow money for any corporate purpose," id. § 31-7-75(17).

---

499 U.S. 365, 111 S. Ct. 1344, 113 L. Ed. 2d 382 (1991), forbids us to accept the Commission's argument. We may not "look behind" governmental actions for "'perceived conspiracies to restrain trade.'" Id. at 379, 111 S. Ct. at 1353 (quoting Hoover v. Ronwin, 466 U.S. 558, 580, 104 S. Ct. 1989, 2001, 80 L. Ed. 2d 590 (1984)). We may not "deconstruct[] . . . the governmental process" or "prob[e] . . . the official 'intent'" to determine whether the government's decision-making process has been usurped by private parties. Id. at 377, 111 S. Ct. at 1352. We therefore must reject the Commission's argument that because the plan at issue was formulated by PPHS and HCA, Inc. and presented by PPHS to the Authority, the plan's execution would constitute only private action.

12

The statute, indeed, goes further. It also authorizes the authorities more generally to "make and execute contracts and other instruments necessary to exercise the[ir] powers," id. § 31-7-75(3), and to "exercise any or all powers now or hereafter possessed by private corporations performing similar functions," id. § 31-7-75(21). To fulfill its mission to promote public health, the Authority can in effect deploy any power a private corporation could in its stead. And it enjoys powers that private corporations do not. It may "acquire by the exercise of the right of eminent domain any property essential to [its] purposes." Id. § 31-7-75(12). And although the Authority has no power to tax, id. § 31-7-84(a), the statute authorizes local governments to impose a tax to cover some of the Authority's expenses, see id. § 31-7-84(a)–(b), freeing the Authority to price its health services below cost.

Most important in this case, however, is the Georgia legislature's grant of the power to "acquire by purchase, lease, or otherwise . . . projects," id. § 31-7-75(4), which, again, include hospitals, id. § 31-7-71(5), and the power to "lease . . . for operation by others any project," id. § 31-7-75(7). This grant makes clear that the Authority is authorized to acquire and lease Palmyra. Moreover, in granting the power to acquire hospitals, the legislature must have anticipated that such acquisitions would produce anticompetitive effects. Foreseeably,

13

acquisitions could consolidate ownership of competing hospitals, eliminating competition between them. This case, therefore, is not materially different from Lee County, where we held that the Florida legislature must have anticipated that granting the power to acquire hospitals to a county hospital board of directors would likely diminish competition. 38 F.3d at 1191–92.

The Commission argues that Lee County is distinguishable because the Florida statute in that case concerned the hospital board of only one county. See id. at 1186. For that reason, the Commission insists, the Florida legislature likely acted on detailed knowledge of the competitive conditions in that specific county. Here, by contrast, the Hospital Authorities Law applies statewide. We thus have no reason, according to the Commission, to believe that when the Georgia legislature enacted that statute, it was similarly familiar with competitive conditions in the geographic area affected by the Authority's acquisition of Palmyra.

Nevertheless, the Georgia legislature must have anticipated anticompetitive harm when it authorized hospital acquisitions by the authorities. It defies imagination to suppose the legislature could have believed that every geographic market in Georgia was so replete with hospitals that authorizing acquisitions by the authorities could have no serious anticompetitive consequences. The

legislature could hardly have thought that Georgia's more rural markets could support so many hospitals that acquisitions by an authority would not harm competition. We therefore conclude that, through the Hospital Authorities Law, the Georgia legislature clearly articulated a policy authorizing the displacement of competition.

The Commission also points to a 1993 amendment to the Hospital Authorities Law. See Act of Apr. 13, 1993, sec. 1, § 31-7-72.1, 1993 Ga. Laws 1020, 1020–22 (codified at O.C.G.A. § 31-7-72.1). That amendment allows mergers between two hospital authorities when they exist within a single, high-population county, O.C.G.A. §§ 31-7-72.1(a), 31-7-73(a), and declares that, in undertaking such mergers, "hospital authorities are acting pursuant to state policy and shall be immune from antitrust liability to the same degree and extent as enjoyed by the State of Georgia," id. § 31-7-72.1(e). According to the Commission, this amendment suggests that in 1993—more than fifty years after the original Hospital Authorities Law, 1941 Ga. Laws 241 (codified as amended at O.C.G.A. § 31-7-70 et seq.), was enacted—the Georgia legislature concluded that other provisions of the law, including those that authorize the authorities to acquire hospitals, did not clearly articulate a policy to displace competition. And, the Commission suggests, the legislature chose—again, in 1993—not to change

15

that state of affairs.

What matters, though, is whether anticompetitive effects were anticipated "at the time the legislation was enacted." Lee Cnty., 38 F.3d at 1192. At that time—when the original Hospital Authorities Law created the authorities and empowered them to acquire hospitals, §§ 3, 5, 1941 Ga. Laws at 242–44—anticompetitive effects were indeed anticipated. The views of a much later legislature do not change that fact. See, e.g., United States v. X-Citement Video, Inc., 513 U.S. 64, 77 n.6, 115 S. Ct. 464, 471 n.6, 130 L. Ed. 2d 372 (1994) ("[T]he views of one Congress as to the meaning of an Act passed by an earlier Congress are not ordinarily of great weight . . . ."); United States v. Sw. Cable Co., 392 U.S. 157, 170, 88 S. Ct. 1994, 2001, 20 L. Ed. 2d 1001 (1968) ("[T]he views of one Congress as to the construction of a statute adopted many years before by another Congress have very little, if any, significance." (internal quotation marks omitted)). We accordingly conclude that the acquisition of Palmyra and its subsequent operation at the Authority's behest by PPHS are authorized pursuant to a clearly articulated state policy to displace competition.[13] The execution of the

---

[13] The Commission's argument that no such policy has been articulated also emphasizes that the Authority's acquisition of Palmyra was engineered by PPHS, with the Authority approving the transaction after little or no deliberation, and that it leaves PPHS in control of Palmyra. We reject the suggestion that such private influence, or such private benefit, somehow makes the transaction and its anticompetitive effects unforeseeable. This argument is no more than another manifestation of the Commission's insistence that we disregard City of Columbia's

16

plan, consequently, is protected by state-action immunity.

IV.

For the reasons stated in part III, supra, the judgment of the district court is

AFFIRMED.

---

injunction against "deconstruction of the governmental process and probing of the official 'intent.'"  499 U.S. at 377, 111 S. Ct. at 1352.  See supra note 12.